# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AUSTIN GLADHILL, # 322-221 | * |
| | * |
| v. | * Civil Action Case No. CCB-08-3331 |
| ROBERT SHEARIN, WARDEN, et al. | * |
| | * |
| | * |
| | *** |

**MEMORANDUM**

Pending is a prisoner civil rights complaint under 42 U.S.C. § 1983, as amended, filed pro se by Austin Gladhill ("Gladhill"), an inmate presently confined at the Eastern Correctional Institution ("ECI"). Gladhill requests declaratory and injunctive relief and compensatory and punitive damages. Defendants Bobby P. Shearin, former Warden of Western Correctional Institution ("WCI"); Roderick Sowers, former Warden of Roxbury Correctional Institution ("RCI"); Lt. Olan W. Creek; Lt. Michael Malloy; Mary Ann Saar; Chief of Security Richard Miller; Captain Jerald Ambrose; Lt. Ronald Dickens; and Lt. Mark Gonzalez, by their counsel, move for dismissal or, in the alternative, for summary judgment.[1] Gladhill has filed a reply. Materials outside the pleadings have been considered and defendants' dispositive motion shall be reviewed as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The matter is fully briefed and ready for disposition. For reasons to follow, the court shall deny

---

[1] Bobby Shearin is presently warden of the North Branch Correctional Institution. Roderick Sowers is presently warden of the Maryland Correctional Institution-Hagerstown. Chief of Security Richard Miller formerly held the rank of captain. Captain Ambrose formerly held the rank of lieutenant. Paper No. 33. Respondents' Memorandum, notes 1-4.

Defendants' motion for summary judgment.

## CLAIM PRESENTED

Gladhill claims that Defendants failed to protect him from harm by other inmates in violation of the Eighth Amendment. On June 1, 2007, Gladhill was stabbed by another inmate, Jason Armstrong, at WCI.[2] Gladhill claims that he alerted prison officials many times that his life was in danger because he had previously acted as an informant while an inmate at RCI. Gladhill claims that he submitted many written and oral requests to defendants for protective custody placement prior to the stabbing and his wife also contacted officials by telephone and e-mail. Paper Nos. 1 and 18.

## BACKGROUND

### A. Gladhill's Allegations and Exhibits

### 1. Incarceration RCI

In May of 2006, Gladhill began acting as an informant at the RCI, reporting directly to Lt. Ambrose and Lt. Dickens. He also reported to their supervisor Captain Miller. Gladhill claims that he came under suspicion on his tier in August of 2006, after he reported a heroin shipment to Lt. Dickens. Lt. Dickens provided the information to another officer who, according to Gladhill, "botched the search." Amended Complaint at 3, Paper No. 18. Gladhill states that Lt. Dickens later apologized to him that he had given the information to the other officer. *See id.*

Gladhill states that on August 1, 2006, a member of the Black Guerilla Family ("BGF") attempted to attack him. Gladhill reported this information and was placed on administrative segregation by Lt. Ambrose. Several weeks later, Gladhill's wife, Anna Gladhill, received threatening letters from Gladhill's former cell mate Tommy Thomas. *See id.* at 4. Thomas also

---
[2] Gladhill is presently incarcerated at the Eastern Correctional Institution (ECI) in protective custody.

threatened to harm Gladhill. Anna Gladhill provided copies of the letters which were given to Captain Miller. *See id.*

Approximately one week later, many BGF members were assigned to Gladhill's housing tier following a fight between rival prison gangs. *See id.* at 4; *see also* Paper No. 18, Exhibit A. Gladhill started receiving death threats and wrote to case management officials to request long-term protective custody status. *See id.* at 4. Gladhill received no response. *See id*. Gladhill asserts that he spoke with Lt. Gonzalez at his administrative segregation review, Lt. Gonzalez told Gladhill would speak to the Warden. *See id*. at 4-5.

Gladhill also claims that he sent an ARP to Warden Sowers in which he stated that his life was in imminent danger from the BGF and Dead Man Incorporated ("DMI") prison gangs, but received no reply. *See id*. at 5.[3] Anna Gladhill telephoned corrections officials for help and spoke with "all of the officials at Roxbury and even sent an e-mail to the Warden of Roxbury and Commissioner Mary Ann Saar."[4] *Id*. According to Gladhill, "the e-mail and calls went ignored." *Id.*

On October 27, 2006, Gladhill filed emergency ARP # RCI-1562-06 claiming that he was being housed with the "same gang members that are trying to kill me. I am being denied safe housing as I requested. I cannot go to recreation as a result. The institution will not protect me." Paper No. 33, Exhibit 21 at 30. Attached to the ARP were letters to Lt. Ambrose dated October 27, 2006, in which Gladwell stated that BGF General Commander Dominic Kane, "Fish" and other gang members on the same hall have a hit on him. "I would not have wrote [sic] you

---

[3] Gladhill might be referencing ARP-1283-06 which was withdrawn on November 1, 2006, one day before his transfer to WCI. Paper No. 33, Exhibit 21 at 11-13.

[4] Defendants note that it is not clear whether Gladhill filed an ARP or an ARP appeal with Mary Ann Saar, who was then Secretary of Public Safety and Correctional Services.

requesting long term protective custody if I did not think the situation required it. I wish I did not have to go there, but if I get sent to any general population housing in this state I can promise you a situation will develope [sic] that will either result in me being harmed, or me checking in on protective custody there." *Id*. at 31. Gladwell further wrote:

> There is no way I should have ever come in contact with the same gang members who are trying to kill me. If I am not currently on protective custody, then I want to be. I am requesting to be moved to a more secure location, that is why I am requesting W.C.I. "S" housing to prevent further problems. Please be advised that since Mrs. Leisinger does not seem to get the point, I have forwarded copies of this on a formal remedy to headquarters.

*Id*. Also attached to the ARP was a letter Gladwell sent to case manager Karen Leisinger dated October 27, 2006. That letter states in part:

> I received your letter stating that you and some you refer to as "we" believe that it is safe for me to be housed in general population in the Maryland prison system.
>
> How you came to this erroneous conclusion is beyond my all logic [sic] and common sense, but then that is not uncommon for the administration of this institution. Let me explain to you that not only is it a widespread fact that I was working as an informant for Gang coordinator Lt. Ambrose, but now this administration has moved every single gang member that I am being hunted by, less than five cell doors down from me.

*Id*. at 32. Gladwell continued that Tommy Thomas bragged that he had sent a threatening letter to BGF General Commander Dominic Kane and signed Gladwell's name. Gladwell's letter to Karen Leisinger also states:

> Now if you don't think I am in a very serious situation, then why can't I go out to recreation over here? I am going to tell you why: When I came to this unit I met with Lt. Ambrose and explained to him about how the gang was trying to stab me. I signed papers requesting <u>Protective Custody</u>. I did not ask for or sign papers for administrative segregation.

4

*Id.* (emphasis in original). Gladwell withdrew the ARP on December 15, 2006. *Id*. at 26. At the time he withdrew the ARP, he was an inmate at WCI.

On November 2, 2006, Lt. Dickens and Lt. Ambrose informed Gladhill that he was to be transferred to the general population at WCI that same day. Gladhill objected to the transfer and inquired about his request for protective custody. According to Gladhill, Lt. Dickens said that the paperwork would take too long and Gladhill would be "allright" at WCI. Paper No. 18 at 5.

### 2. Incarceration at WCI

Gladhill was placed in general housing at WCI. Paper No. 18, Exhibit 33 at 3. Shortly after arriving at WCI, Gladhill saw Sean Reaves, whom he describes as Lieutenant Commander of the BGF and the person directly responsible for the contract on his life. Accordingly to Gladhill, Reaves transferred to WCI soon after Gladhill. Gladhill alleges that "[u]pon discovering that Plaintiff [Gladhill] was on the unit he [Reaves] immediately began informing other BGF members of Plaintiff's status. He himself was also housed on Segregation so he could not attack Plaintiff himself." Paper No. 18 at 6.

Anna Gladhill called Lt. Dickens at RCI and Lt. Malloy at WCI to inform them of the danger. Anna Gladhill "specifically informed Lt. Malloy that Plaintiff belonged on protective custody." *Id*. Her calls were ignored. *Id.* Gladhill wrote to the Warden on May 24, 2007 that he was in danger and needed protective custody. *Id*. at 6-7. Gladhill states that he has had many problems with gang members, but he is "skilled at avoiding the various traps. . . . It was very apparent to plaintiff and his wife that Officials were not going to place Plaintiff on protective custody until he was hurt." *Id*. at 6.

5

On June 1, 2007, while walking to the dining hall, Gladhill was stabbed multiple times in the back of his head, neck, and left hand.[5] Gladhill describes his assailant, Jason Armstrong, as the "main enforcer" for the BGF. *Id.* In the medical department after the stabbing, Gladhill said to Lt. Creek, "I guess that you finally believe me that I need P.C. now huh?" *Id.* (internal quotations omitted). Gladhill was placed in protective custody. Gladhill asserts that he is constantly in pain and has lost mobility in his left hand since the attack.

### 3. Gladhill's Exhibits

In support of his claims, Gladhill has filed the following exhibits:

a. Declaration of Christopher Sorger

Christopher Sorger declares that beginning on August 1, 2006, he was housed next to Gladhill in administrative segregation at RCI. Sorger states that he witnessed Gladhill's "attempts to gain access to protective custody" and read and signed one of the letters that Gladhill wrote to case management officials requesting long-term protective custody. Paper No. 18, Exhibit A;

b. Letter to Lt. Gonzalez

This is a typewritten letter dated September 26, 2006, signed by Gladhill asking to be placed on long-term protective custody. Gladhill writes, "You know I am on p.c. because the B.G.F. is trying to kill me and they the D.M.I. that also has taken the contract. [sic] I cannot be safely housed anywhere else in the system because they will find out where I am at. Some of the B.G.F. guys over here on this tier already threatened me and said they were going to mail my picture all across the state. Will

---

[5] After the attack, Gladhill was placed on administrative segregation 120 day pending investigation. Paper No. 33, Exhibit 2, Serious Incident Report at 21. On June 6, 2007, Gladhill was reassigned to administrative segregation. Jason Armstrong was placed on Gladhill's enemy list on June 7, 2007. Paper No. 33, Exhibit No. 5. On July 5, 2007, Gladhill was assigned protective custody status. Paper No. 33, Exhibit No. 6. Lt. R. Dickens, the intelligence officer at RCI and Detective Frank Toston of the Hagerstown Police Force, both confirmed that Gladhill had been telling the truth and was an informant. *Id.* at 3. Gladhill was placed in long-term protective custody based on his informant activities at RCI and the Hagerstown Drug Task Force. Gladhill remained on protective custody at WCI until he was transferred to ECI on protective custody status on November 6, 2008. On November 16, 2007, Jason Armstrong pleaded guilty to possession of a dangerous weapon with intent to injure in Allegany County District Court and was sentenced to eighteen months consecutive to the sentence currently served. Paper No. 33, Exhibit 2 at 12.

you please put me in protective custody status? I filed an emergency A.R.P. to the Warden but have not gotten an answer." Paper No. 18, Exhibit B.

The letter is signed by Christopher Sorger and Kenneth Muncy, Jr. as witnesses. *Id*.

c. ARP Request Without Date Stamp

The ARP document is typewritten and signed by Gladhill on October 21, 2006. It was purportedly submitted for ARP consideration while Gladhill was at RCI. It reads;

> I am on Ad-Mid [sic] . . . The gangs have tried to kill me. The staff are ignoring me and being negligent with my life. I was working as an informant for Lt. Dicker and he gave a drug deal I told him about to another Officer and he intercepted the visitor too soon and told her he knew her real address. The problem was I was the only guy with that information now I have a contract on my life. The gangs are sending pictures of me all over the state. Please help.

Paper No. 18, Exhibit C.

d. E-mail from Anna Gladhill to the Inmate Grievance Office and Mary Ann Saars

The e-mail is dated November 1, 2006, and states that there is a "hit" out on Austin Gladhill from the BGF and DMI gangs, that his photographs have been mailed all over the state, and he has requested and been denied protective custody at RCI. Paper No. 18, Exhibit D.

e. Letter to Warden Shearin, Date Stamped May 24, 2007.

Gladhill states that he was involved in intelligence gathering activities at RCI prior to his transfer to WCI. He states that a contract was placed on his life as a result. He reviews what he terms his limited options given his enemies throughout the Maryland corrections system, and requests continued placement on administrative segregation as a "Special Utilities Worker" where there would be no access to unrestrained inmates or long-term custody at MCI-J Paper No. 19, Exhibit A.

This letter was received in the Warden's Office six days prior to the stabbing.

f. Declaration of Anna Gladhill

Anna Gladhill attests that between August 1, 2006 and November 2, 2006, she was involved in and fully informed of the nature of her husband's administrative segregation status. During that time, she photocopied his letters and ARP's to corrections officials where he specifically requested protective custody and informed

7

officials of the fact that gangs were trying ti [sic] kill him. Paper No. 19, Exhibit B, ¶ 4.

## B. Respondents' Motion for Summary Judgment and Exhibits

### 1. RCI Investigations and Intelligence Files

Defendants have filed copies of the following correspondence from Gladhill contained in RCI Investigations and Intelligence Files:

a. A handwritten letter dated January 5, 2006 to Captain Miller concerning access to the library, medical treatment, recreation, and mail delivery. Gladhill requests transfer to WCI "Where I don't have to take it so personal, since I am a member of the community here in Hagerstown." Paper No. 33, Exhibit 10, Unger Decl., Attachment A, July 15, 2010;

b. A typewritten letter to Captain Miller dated August 2, 2006, indicating that "Fish" put a hit out on him and he had "caught a lot of heat" after informing Lt. Dickerson about prison drug activities. Gladhill asks to be sent to the "old jail" and says he that he "would be willing to help them out over there as well. I'm sure Captain Ridenour could use a hand." Paper No. 33, Exhibit 10, Unger Decl., Attachment B;

c. A typewritten note to Lt. Ambrose dated August 24, 2006, stating that he had received a "kite" that morning from Tommy Thomas threatening his wife and family. Paper No. 33, Exhibit 10, Unger Decl., Attachment C;

d. A handwritten note to Lt. Ambrose and Captain Miller dated October 8, 2006, stating that things are "a little out of hand down here for me" because "the whole kitchen crew that's coming to feed at breakfast is BGF." Gladhill states one of the guys is "Fish and Sharkies [sic] right hand man." Gladhill claimed the tier rep "Bones" used rotten milk and fruit to "bomb" his cell. Lastly, he asks "[i]f you could possibly push me out of here soon I would be most grateful." Paper No. 33, Exhibit 10, Unger Decl., Attachment D;

e. A handwritten note to "Whom It may Concern" from "concer [sic] Inmate Tony" dated October 8, 2006, claiming inmates were going to stab a corrections officer. Paper No. 33, Exhibit 10, Unger Decl., Attachment E;

f. A typewritten letter to Lt. Ambrose and "all else concerned," dated October 15, 2006, claiming the BGF and DMI have placed a hit on him and requesting protective custody status. The letter shows that copies were sent to Fred Warren Bennett, Esq.,

8

Warden Sowers, Case Manager Lessinger,[6] Housing Unit Lt. Gonzales, Captain Miller, and Lt. Ambrose. Paper No. 33, Exhibit 10, Unger Decl., Attachment F; and

g. A transmitting memorandum to Warden Sowers from Wanda Miller, Administrative Officer and Inmate Affairs Coordinator, Division of Correction headquarters dated October 30, 2006, with a typewritten letter to the Commissioner of Correction from Gladhill dated October 17, 2006, attached.[7] Paper No. 33, Exhibit 10, Unger Decl., Attachment G. The Commissioner of Corrections, Case Management at Roxbury, Warden Sowers, Lt. Ambrose, and Fred Bennet [sic], Esq. are copied on Gladhill's letter.

In his letter of October 17, 2007, Gladhill states there is a hit on his life from the BGF and DMI because he was an informant for Lt. Ambrose on gang activities. Gladhill states he provided information about a drug delivery and the information was improperly handled by another officer. Gladwell continues:

> [P]eople who were members of these gangs have since come to lockup and transferred to other institutions, some with my pictures and the orders to get me wherever they can.
>
> ********
> …it is not now possible for me to be housed in the system in General Population. In order for me to be in a safe environment, I am requesting to be placed in Long term Protective Custody at the Western Correctional Institution "S" Housing in Cumberland, Maryland.

Paper No. 33, Exhibit 10, Unger Decl., Attachment G

**2. Gladhill's ARP dated June 6, 2007**

After the stabbing, Gladhill filed an ARP on June 6, 2007. In the ARP complaint, he asserted *inter alia* that he had:

> … made several attempts to inform staff of the dire nature concerning my safety. On May 29, 2007 I met with my housing manager Lt. Creek in

---

[6] On October 25, 2006, Karen Leisinger, RCI Case Management Specialist, wrote a memorandum to Gladhill advising him that he was on administrative segregation, not protective custody. Paper No. 33, Exhibit 19. In the letter, she stated that plaintiff was on administrative segregation at RCI for his protection, but it was believed that he could be housed in general population at WCI. She advised that arrangements for his transfer to WCI were underway and Lt. Ambrose had been contract for his assistance. *Id.*

[7] A copy of the October 17, 2006, letter is in Gladhill's base file, along with copies sent to Case Managers Leisinger and Cassidy. Paper No. 33; Defendants' Memorandum, n. 13; *see also* Exhibits 11 and 12.

reference to a letter I sent him advising him of the fact that I had enemies here at W.C. I. Lt. Creek Advised me that 'since these enemies are not documented in your file they do not exist.' . . . I also sent a copy to Lt. Dicker at the Roxbury Correctional Institution who was directly involved in the investigation that ensued and ended with me being transferred to W.C.I. While at the Roxbury Correctional Institution a contract was placed on my life by the gang "Blake Gorilla Family" B.G.F. and the gang "Dead Man Incorporated "D.M.I." As a result of a murder attempt on my life, I requested protective custody, and accordingly I was assigned to Administrative Segregation by Lt. Ambrose. While I was on Administrative Segregation I advised case management and investigators Lt. Ambroe [sic] and Lt. Dicker that there was a contract on my life. I wrote four letters to both case management and special investigations but did not receive a response. While on administrative segregation a riot occurred and a great majority of the gang members who were trying to kill me were placed on lock-up on the same tier where I was housed on administrative segregation. I then began receiving many death threats on my life. This was during the period of August-October 2006. On October 4, 2006, I sent Department of Corrections Headquarters Office a detailed request for Administrative Remedy-requesting to be placed on long term protective custody. This was witnessed by my wife Anna Gladhill. I never received a response. During October 2006, an inmate named Tommy Thomas sent letters to my home threatening my life. My wife turned them over to Captain R. Miller and the inmate was punished and sent to lock-up. As a result of the same gang member who were trying to kill me, being house with me I was unable to conceal where I was being transferred to. Upon realizing that, I wrote case management a letter, and specifically stated that I need to go to long term protective custody because gang members were swearing that they would get me wherever I went in general population.

While I was fighting to protect my life through my many letters to both case management and Headquarters, I was being housed with a man named Kennth Muncy, Jr. and we were next door to Christopher Solder. My wife also had telephone calls directly with Captain R. Miller and Lt. Ambrose. Everything that I tried to do to protect my life went ignored.

Paper No. 33, Exhibit 8, ARP #WCI-0439-07.

On June 29, 2007, Gladhill was advised that no further action would be taken through the ARP process because the matter had been referred to the Internal Investigation Unit. The

ARP was administratively dismissed as final on July 20, 2007. On December 3, 2007, Gladhill appealed the dismissal by filing a grievance with the Inmate Grievance Office (IGO).

### 3. WCI Investigation Report

On July 10, 2007, Detective Sergeant Kandace Mills (Det. Mills) of the Department of Public Safety and Correctional Services Investigative Unit (DPSCS IIU) interviewed Gladhill. Paper No. 33, Exhibit 2 at 7. Gladhill reported to her that he knew Jason Armstrong because they lived in the same housing unit. They had gotten along prior to the assault and had lifted weights together. During the attack Gladhill felt something in the back of his neck and when he swung to defend himself saw the weapon in Armstrong's hand. *See id.* p. 8. Gladhill asked Armstrong "Why the fuck did you do that?" *Id.* Gladhill reported that he had been a gang activity informant at RCI. Gladhill thought that Armstrong was a BGF member and that is why he attacked him. *See id.* Jason Armstrong refused to be interviewed by Det. Mills.

### 4. Administrative Hearing

On March 26, 2008, Administrative Law Judge Thomas G. Welshko conducted a hearing by video conference. Gladhill and Lt. Olan Creek, the WCI Unit Five Manager, testified. The administrative law judge made the following findings:

1. In October and November of 2006, Gladhill and Anna Gladhill alerted DOC headquarters in Baltimore about the threats that gang members had made against his life;

2. In January 2007, Gladhill was transferred from RCI to WCI in response to his requests for protection;

3. Gladhill filed a number of written protests, requests, and suggestions with WCI from January 2007 through later May 2007. He did not identify any specific threats against his safety in any of those communications;

4. Gladhill did not identify any specific threats against him at WCI made by other inmates until May 23, 2007, when he submitted a letter to WCI Warden Shearin;

5. Gladhill's letter reached the Warden's Office on May 24, 2007. It did not reach his housing unit manager until June 15, 2007.

Paper No 33, Exhibit 9 ¶¶ 4-8.

The administrative law judge ("ALJ") questioned the quality of the evidence submitted by Gladhill, noting that the letters and e-mails sent to DOC officials showed no evidence of receipt. He questioned whether the e-mail sent by Anna Gladhill had been properly addressed. The ALJ rejected Gladhill's claim that WCI staff had removed incriminating evidence from his base file that would show they had knowledge of the threats against him as an issue ancillary to the grievance under review. Paper No. 33, Exhibit 9 at 6.

Lt. Creek was called by Gladhill as an adverse witness. Lt. Creek testified that he recalled a conversation with Gladhill about threats against him. According to Lt. Creek, Gladhill vaguely identified the threats and did not supply names of any potential enemies. The ALJ credited Lt. Creek's testimony in his decision which reads in part: "Lieutentant Creek testified emphatically, 'If you give me names, I would have put you on administrative segregation there and then.'" *Id.* at 9. Lt Creek also testified that Gladhill did not request administrative segregation; Gladhill wanted to remain on the same housing unit in the general population. *Id*. In light of the above, the ALJ concluded he could not find that:

> "the DOC was aware of any excessive risks to the Grievant's health or safety or any facts from which inferences could be drawn that a substantial risk of serious harm existed before June 1, 2007. Once he was transferred from RCI to WCI, the Grievant was more concerned about complaining to institutional authorities about the quality of prison life rather than emphasizing threats to his safety. Only on May 23, 2007, did the Grievant communicate in writing that there were threats being made against him. That communication was working its way through channels when inmate Armstrong stabbed the Grievant on June 1, 2007. Had the

Grievant made this communication sooner and listed the names of his potential enemies, WCI could have taken steps to protect him. As it stands, I conclude the DOC did what it could in a dangerous prison environment to ensure the Grievant's safety based on the information it possessed.

*Id.* at 9-10. Gladhill appealed the administrative decision to the Circuit Court for Allegany County. Paper No. 33, Exhibit 9A. Subsequently, he voluntarily withdrew the appeal. Paper No. 33, Exhibit 9B.

> **5. Affidavits in Support of Motion for Summary Judgment**
>
> Defendants have filed the following affidavits:
>
> a. <u>Lt. Ambrose</u> recollects that the majority of Gladhill's "issues" began with his conflicts with Tommy Thomas, his former cell mate. Thomas attempted to start a personal relationship with Anna Gladhill. Paper No. 33, Exhibit 14.
>
> b. <u>Chief of Security Miller</u> recalls that Gladhill had a conflict with Tommy Thomas for writing a letter to plaintiff's wife and defaming Gladhill. Paper No. 33, Exhibit 15. Chief Miller attests that he is aware that Gladhill alleged having conflicts with inmates belonging to the BGF. "Inmate Gladhill alleged that he had given information to the Investigative Office, of which at the time I was the department head, which he alleged compromised his safety at RCI." *Id*. at ¶ 5. Chief Miller recalls that Gladhill wrote to him on several times, at one point to move to the Maryland Correctional Institution-Hagerstown. In October of 2008, Gladhill requested transfer to WCI. *Id.*; *see also* Exhibit No. 10, Attachment A and B.
>
> c. <u>Lt. Dickens</u> attests that he recalls Gladhill's letters to Captain Miller dated January 5, 2006 and August 2, 2006. Paper No. 33, Exhibit 16. Lt. Dickens declares that Gladhill did not object to the transfer for WCI and he was not informed that the paperwork would take too long. *Id*. He recalls that Gladhill commented that "Captain Ridenour could use a hand," implying that he was an informant. Gladhill asked to be sent to WCI, not to be sent down the road, a reference to correctional facilities in Jessup, Maryland. *Id*.
>
> d. <u>Lt. Gonzalez</u> attests that he does not recall Gladhill requesting long-term protective custody status while at RCI. Lt. Gonzalez does not recollect offering to discuss the protective custody for Gladhill with the Warden. Lt. Gonzalez declares that had Gladhill requested protective custody, he would have referred it to the original investigative officer handling protective custody requests, not the Warden. On two

13

occasions when Gladhill submitted ARP requests # 1282-06 and 1283-06,[8] making "statements" about protective custody, Lt. Gonzalez escorted Gladhill to the lieutenant's office in housing unit # 5. "His situation was discussed and on both occasions he [Gladhill] chose to sign an ARP Withdrawal Form." Paper No. 33, Exhibit 22.

e. <u>Lt. Malloy</u> attests that Gladhill had been interviewed prior to this May 23, 2007 letter to the Warden. Gladhill stated that he wanted to remain in the general population. "Additionally, in the forementioned letter, Mr. Gladhill outlines his housing options; one being his desire to remain "on special utilities on housing unit five."[9] At no time did the Complainant inform me of the amount of involvement he had in assisting authorities prior to his current incarceration." Paper No. 33, Exhibit 23 ¶ 3.

Gladhill's May 23, 2007, letter attached to Lt. Malloy's affidavit, reads as follows:

> I am writing to you in regards to the recent change in housing procedures here on Unit 5 W.C.I. This unit is being transformed into Administrative Segregation. A-tier is already converted and the process is being implemented on B-tier where I am currently housed. I am in 5B-6L. The reason I am writing you is because there is an underlying difficulty in all of this for me that I need to establish the facts about before it is too late.
>
> I was transferred to WCI as an exchange prisoner from Roxbury in Hagerstown. My activities at Roxbury involved a great deal of intelligence gathering to which I submitted to Lt. Dickers and Lt. Ambrose. As a result of my efforts and a few missteps in the investigative procedures at Roxbury, I was sent here after being on

---

[8] In ARP 1282-06, Gladhill complained that he was housed in unit 5 on protective custody and there is no policy in place to assure him telephone access. Gladhill filed the ARP on October 24, 2006. He withdrew the ARP on November 1, 2006. Paper No. 33, Exhibit 21 at 6-8.

In ARP 1283-06, filed October 26, 2006, Gladhill stated:

> There is a hit on my life from the B.G.F. gang that was also passed to the D.M.I. The tier I am living on is nearly all the B.G.F. members that are out to get me. I cannot go to recreation because I have been threatened with my life. These same gang members have sent my picture all over the Maryland prison system. I filed an informal request to go to long term protective custody, but that request was ignored. Right now my life is in danger from being housed with the same people who are trying to kill me, and I cannot go to recreation or commissary as a result.

*Id*. at 13. Gladhill withdrew the ARP on November 1, 2006, one day before his transfer to WCI.

[9] Gladhill appears to take the position that a special utilities assignment would protect him from access to unrestrained inmates. The position is "essentially cleaning, and feeding by passing trays through a slot in the [cell] door." Paper No. 19, Exhibit A (hand written notes).

> Administrative segregation myself. A contract was placed on my life at Roxbury which was negotiated between the rival gangs. The majority of the gang members got into a major brawl at Roxbury and subsequently went on Segregation as well while I was pending transfer and waiting to leave Roxbury. These gang members were sent all through the Maryland system.
>
> **********************
>
> I have enemies in unit-2 on this compound that stem from my extensive work with the Washington County Narcotics task force during 1994-1995. I am truly in a position where there are limited options for me. I have submitted a request to housing unit manager Lt. Creek to request that he keep me on this unit as a "Special Utilities Worker," where I would essentially be feeding up trays and helping with sanitation. My only other option would be to wait for the move where I know I will have to defend myself one way or another, or I can go on Administrative Segregation myself and my option would be MCI-J or long-term protective custody. I am sending you this request to remain on special utilities on housing unit five.

Paper No. 33, Exhibit 23 at 2-3.

## STANDARD OF REVIEW

A court may properly award summary judgment in federal cases if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine issue of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a defendant's motion for summary judgment. *Id*. at 252. The facts themselves, and the inferences to be drawn from the underlying

15

facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial, Fed. R. Civ. P. 56(e)(2). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(1)(A).

## ANALYSIS

The gravamen of Gladhill's complaint is that defendants failed to protect him from violence by another inmate at WCI by failing to place him in protective custody. In order to be liable under the Eighth Amendment for failure to protect, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official's duty under the Eighth Amendment is to ensure reasonable safety. *Id*. at 844. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

Defendants assert that there is no evidence Department of Correction officials and staff were deliberately indifferent to Gladhill's safety or ignored facts from which an inference could be drawn of a substantial risk of serious harm.[10] Defendants note that Gladhill did not identify

---

[10] Defendants contend that the ALJ's determination bars judgment for Gladhill under the principles of issue preclusion. Even if the court accepts the factual findings of the ALJ pursuant to the principles of issue preclusion, the Defendants are not entitled to summary judgment. The issues presented in Gladhill's § 1983 claim go beyond the issues addressed by the ALJ, which were limited to the determination of whether WCI officials failed to protect

16

Jason Armstrong as an "enemy," that they had gotten along prior to the assault, and that prior to the assault, Gladhill indicated to officials that he wanted to remain in the general population.

In this case, however, Gladhill had been an informant for DOC officials at RCI. He was placed in administrative segregation at RCI due to safety concerns of gang retaliation for his cooperation and was transferred to WCI in response to these issues. Gladhill alerted officials that he was unsafe because his informant status had been spread to gang members throughout the prison system and requested protective custody. Ultimately, Gladhill's assailant proved to be an inmate with whom he had no prior conflict but was allegedly a prison gang "enforcer." Gladhill's request for special utilities worker status in the general population appears to have been premised on his belief the position would protect him from access to unrestrained inmates.

This case presents unresolved questions of fact rendering this matter inappropriate for summary judgment. In light of Gladhill's repeated requests for protection, genuine issues of material fact remain whether defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm to Gladhill existed and that defendants drew the inference, but failed to act.[11]

---

Gladhill based on his own self-reporting of threats against him. The ALJ did not consider whether RCI officials failed to protect Gladhill by not informing WCI officials that Gladhill was an informant who had received documented threats from the BGF in the past, or whether WCI had in fact received such information from RCI or other sources in addition to Gladhill. Gladhill's § 1983 claim, therefore, is not barred by the doctrine of issue preclusion.

[11] Defendants' assertion of qualified immunity as an affirmative defense is also unavailing; if Gladhill's version is correct, evidence is sufficient such that a jury could conclude that defendants' actions violated a constitutional right that was clearly established at the time of the violation. *See, e.g.*, *Witt v. West Virginia State Police*, -- F.3d --, 2011 WL 338792, at *3-5 (4th Cir. 2011).

## CONCLUSION

Defendants' motion for summary judgment is denied.  The court shall grant Gladhill twenty-eight days to move for appointment of counsel.  A separate order follows.


<u>March 22, 2011</u>                                              _____/s/_____
Date                                                                    Catherine C. Blake
                                                                              United States District Judge

18